808 A.2d 149 (2002)
354 N.J. Super. 500
Rosa ACUNA, Administratrix ad Prosequendum of the Estate of Michael Doe (fictitious name of a real individual), deceased infant of Rosa Acuna, General Administratrix of the Estate of Michael Doe (fictitious name of a real individual), deceased infant of Rosa Acuna, and Rosa Acuna, individually, Plaintiffs-Appellants,
v.
Sheldon C. TURKISH, M.D., Obstetrical and Gynecological Group of Perth Amboy-Edison, a Partnership or P.C. organized under the State of New Jersey, Janet Jones, R.N. (a fictitious name of a real individual), Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 2002.
Decided October 29, 2002.
*150 Harold J. Cassidy, Holmdel, argued the cause for appellants (Cassidy, Messina & *151 Laffey, attorneys; Mr. Cassidy, on the brief).
John Zen Jackson, Liberty Corner, argued the cause for respondents Sheldon C. Turkish, M.D. and Obstetrical-Gynecological Group of Perth Amboy-Edison (Kalison, McBride, Jackson & Murphy, attorneys; Mr. Jackson, on the brief).
Before Judges HAVEY, A.A. RODRIGUEZ and PAYNE.
The opinion of the court was delivered by HAVEY, P.J.A.D.
This is a medical malpractice, informed consent case. The gravamen of the complaint, filed by plaintiff Rosa Acuna individually, and in her capacity as Administratrix of the Estate of "Michael Doe," is that defendant Dr. Sheldon C. Turkish (defendant), a medical doctor specializing in the field of obstetrics and gynecology, failed to obtain an informed consent from plaintiff before terminating her pregnancy. Specifically, plaintiff claimed that defendant "failed to inform her that [the fetus, Michael Doe], although a person unborn, was a complete, separate, unique and irreplaceable human being...."
By leave granted, plaintiff appeals from an order for summary judgment dismissing counts one and two of her complaint setting forth a wrongful death cause of action against defendant and his medical group, in which she seeks to recover pecuniary loss "as the result of the death of the child...." Plaintiff also appeals from the dismissal of count five, setting forth a cause of action for her emotional distress suffered as a result of the "loss of her son."
We affirm dismissal of the wrongful death counts. The Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, "does not permit recovery attributable to the wrongful death of an infant before birth." Giardina v. Bennett, 111 N.J. 412, 413, 545 A.2d 139 (1988). We reject plaintiff's argument that depriving her of a wrongful death remedy violates the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution.
However, we reverse dismissal of plaintiff's emotional distress claim. In the event plaintiff establishes a medical malpractice claim based on a lack of informed consent, defendant's tortious conduct constitutes a direct tort against plaintiff, entailing emotional distress and mental suffering arising from the loss of a fetus.[1]

I
The evidentiary material considered in a light most favorable to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), presents the following factual background. On April 6, 1996, plaintiff consulted Dr. Turkish because of abdominal pain. At the time, plaintiff was twenty-nine years of age and had two children, two and one-half years and nine months old, the latter having been delivered by defendant by caesarian section. Defendant examined plaintiff and, and according to plaintiff, advised her that she was pregnant and needed an abortion because "[y]our kidneys are messing you up." Plaintiff interpreted defendant's diagnosis and warnings to mean that, without an abortion, she only had three months *152 to live. In his deposition, defendant testified that he performed a pelvic examination and administered a sonogram, which revealed that the gestational age of the fetus was approximately seven weeks old.
Plaintiff was not concerned how the termination of pregnancy would be performed. Rather, she asked defendant whether "the baby was already there." She testified in her deposition that "[o]bviously I knew I was pregnant, I just needed to know and I wanted to know if the baby wasif there was a baby already in me." By baby, she meant "human being" or "[l]ife in there." According to plaintiff, defendant replied "don't be stupid, it's only blood." Defendant testified he did not remember plaintiff asking that question, but acknowledged that if a patient had asked it, he would have answered that a "seven-week pregnancy is not a living human being."
On April 9, 1996, plaintiff signed a consent form for a termination of pregnancy (TOP), which stated in its entirety, "I hereby give my consent for Dr. Turkish to perform a TOP. He has explained all the risks and complications to me." On April 9, 1996, defendant performed a vacuum aspiration.[2] Defendant admitted that the vacuum aspiration procedure "in fact, kills the fetus." However, plaintiff continued to bleed for several weeks and, on May 4, 1996, the bleeding became extremely heavy. She was taken to Robert Wood Johnson Hospital where she was diagnosed with an incomplete abortion. At the hospital, plaintiff underwent a dilatation and curettage (D and C). According to plaintiff, the nurse caring for her explained that the procedure was necessary because "the [previous] doctor [defendant] had left parts of the baby inside of you."
Plaintiff's expert, Theresa Karminski Burke, a psychologist, concluded that, as a result of the termination of pregnancy, plaintiff suffered severe emotional and psychological trauma, which led to the development of acute post-traumatic stress disorder, obsessive compulsive disorder, major clinical depression and psychosexual dysfunction.
In granting summary judgment to defendants dismissing both the wrongful death and emotional distress counts, the trial court viewed the central issue as being whether "a six to eight week fetus is a constitutional person; and the answer is no." Citing Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the trial court reasoned that, although it sympathized with plaintiff's argument, it "must adhere to the fact that the highest Court of this country has held that a fetus is not a human being under our constitution." Consequently, the wrongful death claim "must be dismissed." Citing Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980), the court concluded that the fetus' lack of status as a "constitutional person" also precluded a cause of action by plaintiff for negligent infliction of emotional distress, since that cause of action requires proof of an intimate, familial relationship between plaintiff and an injured "person."

II

WRONGFUL DEATH CLAIMS
Plaintiff first argues that the trial court erred in dismissing her wrongful death claims under counts one and two.
The Wrongful Death Act provides in N.J.S.A. 2A:31-1:

*153 When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime.
[Emphasis added.]
Plaintiff acknowledges that the Supreme Court in Giardina, supra, 111 N.J. at 413, 545 A.2d 139, held that the Act "does not permit recovery attributable to the wrongful death of an infant before birth." The Court so held after reviewing the legislative history of the Act. It observed:
The distinctive statutory nature of this derivative cause of action, the historical origins of this statute and the subsequent history and evolution of the Wrongful Death Act in this state suggest that the traditional definition of "person" under the Act be retained. We are persuaded ultimately because we find no compelling underlying policy that would impel us to give the statutory term "person" an expansive interpretation here.
[Id. at 427, 545 A.2d 139.]
Nevertheless, plaintiff challenges the constitutionality of the Act as applied in Giardina. She argues that denying her recovery under the Act, "in light of the fact that she can prove every element of the claim and [that] she sustained exactly the same loss as mothers who are allowed recovery," violates her Equal Protection Rights under the Fourteenth Amendment of the United States Constitution. She observes that, under Giardina, "[i]f a child is injured in utero, at any age of gestation, but lives but for a moment outside the mother, Wrongful Death damages may be recovered. If the same child, at the same age, is injured in utero by the same tortious act, but his death ensues in the mother's body, the mother may not recover these damages." She reasons that this distinction is irrational because a mother's entitlement to wrongful death damages should "not depend on where her child happened to be at the time the death ensued...." Plaintiff adds that this "irrational" distinction frustrates the Wrongful Death Act's purpose of protecting all mothers, as well as the sanctity of life.
A similar argument was presented to and rejected by the Third Circuit in Alexander v. Whitman, 114 F.3d 1392, 1400 (3rd Cir.), cert. denied, 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997). There, the court determined that a mother "can only establish a [wrongful death] claim on behalf of her child ... if her child ... fall(s) within the protections afforded `person[s]' as that term is used in the Fourteenth Amendment, and it is clear that it does not." Id. at 1400 (citing Roe v. Wade, supra, 410 U.S. at 158, 93 S.Ct. at 729, 35 L.Ed.2d at 180, holding that the word "person" as used in the Fourteenth Amendment does not include the unborn). The court added that the fact that plaintiff's pleadings and expected proofs support the conclusion that a fetus was a "human being" did not alter the legally established definition of "persons" under the Fourteenth Amendment. Alexander, supra, 114 F.3d at 1401.
Plaintiff dismisses the holdings in Roe and Alexander on the basis that she does not challenge the statutory classification of pre-birth fetus and born children. Rather, she seeks equal protection for herself as a mother, a member of a constitutionally protected class, who has the same relationship with her fetus as mothers who *154 give birth to live babies. She adds that because the Wrongful Death Act implicates a mother's fundamental interest in her relationship with her child, the "strict scrutiny" standard applies, and thus only a compelling state interest can justify the distinction made by the Giardina Court.
The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. This protection has been explained as follows:
The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed.
[Washington Nat'l Ins. Co. v. Board of Review, 1 N.J. 545, 553, 64 A.2d 443 (1949).]
The equal protection guarantee applies to the decisions of the courts as well as to the acts of the Legislature. Jersey Shore Med. Center-Fitkin Hosp. v. Baum's Estate, 84 N.J. 137, 145, 417 A.2d 1003 (1980). Also, "`[f]ederal equal-protection analysis employs different tiers of review: strict scrutiny when an act involves a fundamental right or a suspect class; intermediate scrutiny when an act involves a semi-suspect class; and minimal rational-basis scrutiny in all other cases.'" McCann v. Clerk, City of Jersey City, 167 N.J. 311, 325, 771 A.2d 1123 (2001) (quoting Drew Assocs. v. Travisano, 122 N.J. 249, 258, 584 A.2d 807 (1991)).
In support of application of the strict scrutiny test, plaintiff relies on the United States Supreme Court's decisions in Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Glona v. American Guar. & Liab. Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); and Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). In Levy, the Court declared unconstitutional on equal protection grounds a Louisiana statute denying illegitimate children the right to maintain an action for their mother's wrongful death. 391 U.S. at 71, 88 S.Ct. at 1511, 20 L.Ed.2d at 439. In Glona, the Court held that Louisiana violated the Equal Protection Clause by denying statutory recovery by surviving mothers for the wrongful death of illegitimate children. 391 U.S. at 75, 88 S.Ct. at 1516, 20 L.Ed.2d at 443. Finally, in Weber, the Court held that a Louisiana workmen's compensation statute that denied wrongful death benefits to a dependent, unacknowledged illegitimate child that were provided to legitimate and to acknowledged illegitimate children violated the Equal Protection Clause of the Fourteenth Amendment. 406 U.S. at 173-76, 92 S.Ct. at 1405-07, 31 L.Ed.2d at 779.
Contrary to plaintiff's argument, the cited cases applied the "rational basis," rather than the "strict scrutiny" test. See e.g., Levy, supra, 391 U.S. at 71, 88 S.Ct. at 1511, 20 L.Ed.2d at 439 ("[t]hough the test has been variously stated, the end result is whether the line drawn is a rational one"). Although Levy observed that "[t]he rights asserted here involve the intimate, familial relationship between a child and his own mother," the Court's holding is based on irrational classification, not interference with that relationship. Ibid. "When the child's claim of damage for loss of his mother is in issue, why, in terms of `equal protection,' should the tortfeasors go free merely because the child is illegitimate?" Ibid. In each case, no rational basis for the statutory distinction was present, and no state interest in legitimate family relations was being served. Weber, *155 supra, 406 U.S. at 175, 92 S.Ct. at 1406, 31 L.Ed.2d at 778-79; Glona, supra, 391 U.S. at 75, 88 S.Ct. at 1516, 20 L.Ed.2d at 443.
Here, as well, we find no fundamental rights implicated by Giardina's holding that the Wrongful Death Act does not permit recovery attributable to the wrongful death of a fetus. Plaintiff is correct that a woman may have a fundamental right to a relationship with her child. See In re Baby M, 109 N.J. 396, 447, 537 A.2d 1227 (1988) ("the rights of personal intimacy, of marriage, of sex, of family, of procreation ... are fundamental rights protected by both the federal and state Constitutions"). However, plaintiff's premise is contradicted by the terms of the Wrongful Death Act itself. Nothing in the Act attempts to classify mothers, or give them special status based on whether or not they are pregnant, nor does the statute, on its face, focus on any special familial relationship or even the sanctity of life.
Moreover, as applied by Giardina, nothing in the Act interferes with a mother's relationship with her fetus. Whether or not a mother's relationship with her unborn child is a fundamental right is not dispositive because the Act does not affect plaintiff's "relationship" with her unborn child. As the Alexander court observed, "[a] mother's relationship with her fetus is exactly the same whether or not she can bring a wrongful death or survivor action. It is not the relationship that is affected here, it is the ability to recover for the loss of that relationship." Alexander, supra, 114 F.3d at 1404. It is difficult to imagine, for example, that a mother would consider the availability or nonavailability of a wrongful death remedy in making her choice whether or not to terminate her pregnancy in the informed consent context. See ibid. ("[i]t is impossible for us to imagine that any such decision [the mother made or might have made about her stillborn child] would be the least bit influenced by whether or not a mother could bring a wrongful death or survival action to recover damages for the loss of a fetus").
Absent a fundamental right, suspect class or semi-suspect class, we do not hesitate to apply the rational basis test in this case. The question is whether the challenged statute is supported by any "conceivable rational basis." Greenberg v. Kimmelman, 99 N.J. 552, 563, 494 A.2d 294 (1985). "The equal protection guarantee is offended only if the classification is wholly unrelated to the legislative objective." In re Regulation of Operator Serv. Providers, 343 N.J.Super. 282, 324, 778 A.2d 546 (App.Div.2001). In applying that standard, we find no indiscriminate classification. "`The fundamental purpose of the wrongful death action is to compensate survivors for the pecuniary losses they suffer because of the tortious conduct of others.'" Smith v. Whitaker, 160 N.J. 221, 231, 734 A.2d 243 (1999) (quoting Alexander, supra, 114 F.3d at 1398); see also LaFage v. Jani, 166 N.J. 412, 430, 766 A.2d 1066 (2001) ("our Wrongful Death Act is remedial in nature and is designed `to compensate surviving dependents for the pecuniary losses resulting from the death' of, in many cases, the `breadwinner'"; quoting Kibble v. Weeks Dredging & Constr. Co., 161 N.J. 178, 189, 735 A.2d 1142 (1999)). Simply stated, the Act focuses on dependency and pecuniary loss. As such, its classifications are rationally related to its purpose. See N.J.S.A. 2A:31-4 ("[t]he amount recovered ... shall be for the exclusive benefit of the persons entitled to take any intestate personal property of the decedent, and in the proportions in which they are entitled to take the same. If any of the persons so entitled were dependent on the decedent at his death, they shall take the same as though *156 they were sole persons so entitled, in such proportions, as shall be determined by the court without a jury").
Moreover, Giardina's application of the Act does not leave an aggrieved mother without a remedy. The Court accommodates the rights of parents by recognizing a common law cause of action to recover for emotional distress and mental anguish arising from the death of an infant before birth. See infra at III. The Court's determination that no cause of action under the Wrongful Death Act existed was based not only on its perception that a fetus was not intended to be included as a "person" under the statute, but also that, to modify the statute to include a fetus in the term "person," was "unnecessary in light of the concomitant common-law right we determine to exist" in a parent to recover for emotional distress arising out of the death of an unborn fetus. Giardina, supra, 111 N.J. at 428, 545 A.2d 139. Plaintiff's constitutional challenge to the Wrongful Death Act is therefore rejected.

III

EMOTIONAL DISTRESS CLAIM
Plaintiff's emotional distress claim is founded on the proposition that defendant "terminated the life" of plaintiff's "child" under circumstances where he denied plaintiff the ability to make an informed decision whether or not to consent to the procedure. She argues that defendant failed to tell her a material fact; "that a reasonable and prudent patient in [plaintiff's] circumstance would want to know whether the proposed procedure would terminate the life of an existing human being." The trial court concluded that there were fact issues concerning the informed consent issue, but, as noted, dismissed the claim on the ground that the fetus was not a "constitutional person."
A physician's duty of disclosure in the typical malpractice case is measured by the "prudent patient" or "materiality of risk" standard. Largey v. Rothman, 110 N.J. 204, 212-13, 540 A.2d 504 (1988); Blazoski v. Cook, 346 N.J.Super. 256, 267, 787 A.2d 910 (App.Div.), certif. denied, 172 N.J. 181, 796 A.2d 897 (2002). The standard relates to the patient's needs, not the physician's judgment. Niemiera v. Schneider, 114 N.J. 550, 565 n. 4, 555 A.2d 1112 (1989). "[A] physician must disclose to a patient all material information that a `prudent patient' might find significant for a determination whether to undergo the proposed [medical procedure]." Id. at 562, 555 A.2d 1112. This standard is objective. Largey, supra, 110 N.J. at 211, 540 A.2d 504. "The test for determining whether a particular risk must be disclosed is its materiality to the patient's decision, i.e., all risks potentially affecting the decision must be divulged." Blazoski, supra, 346 N.J.Super. at 268, 787 A.2d 910 (citing Largey, supra, 110 N.J. at 211-12, 540 A.2d 504). Aside from establishing that the physician failed to comply with this applicable standard of disclosure, a plaintiff must also establish proximate cause. Largey, supra, 110 N.J. at 215, 540 A.2d 504; see also Howard v. University of Med. & Dentistry of N.J., 172 N.J. 537, 559, 800 A.2d 73 (2002) (a plaintiff must "show a causal connection between the inadequately disclosed risk of the procedure and the injury sustained"). Plaintiff must demonstrate that a prudent person under her circumstances would not have consented and submitted to the medical procedure had she been properly informed. Teilhaber v. Greene, 320 N.J.Super. 453, 465, 727 A.2d 518 (App.Div.1999). Thus, the issue of causation is also governed by an objective standard. Largey, 110 N.J. at 215-16, 540 A.2d 504.
*157 Applying these principles in the context of a termination of pregnancy context raises difficult questions because moral, philosophical or religious beliefs may be implicated in a woman's choice. Therefore, during oral argument before us, both parties have agreed that it is premature to define what duty of care is owed by a physician in this context. The parties also rightly agree that we should not, at this posture of the case, address the fact-sensitive issues concerning what dangers incident to, or consequences resulting from, such a procedure would be "material" to the "prudent patient." Both parties concur that resolution of these issues should await a complete factual record. Therefore, we do not address these perplexing issues. Consequently, solely for the purpose of addressing the narrow issue before us, we will assume that defendant owed a duty to plaintiff to disclose all material information that a prudent patient might find significant in deciding whether or not to terminate her pregnancy. We also assume that defendant breached that duty, and the breach was a proximate cause of plaintiff's choice to undergo the procedure.
We conclude that the trial court erred in dismissing her emotional distress claim on the basis that a fetus is not a "constitutional person." Roe indeed held that the word "person" as used in the Fourteenth Amendment does not include the "unborn." Roe, supra, 410 U.S. at 158, 93 S.Ct. at 729, 35 L.Ed.2d at 180. However, Roe involved a woman's privacy right, derived from the Due Process Clause of the Fourteenth Amendment's "concept of personal liberty and restrictions upon state action...." 410 U.S. at 153, 93 S.Ct. at 727, 35 L.Ed.2d at 177. The issue in Roe was whether that privacy right is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Ibid. The Court held that "the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." 410 U.S. at 154, 93 S.Ct. at 727, 35 L.Ed.2d at 177-78.
Roe is not dispositive here because this is not a case implicating a government's attempt to limit a woman's privacy right to terminate a pregnancy. Crediting plaintiff's proofs, it is about a woman who claims severe emotional distress caused by medical advice resulting in her grudging consent to terminate a pregnancy, purportedly given because of defendant's failure to advise her of the material consequences of the procedure. The fact that a fetus may not be a "person" under the Fourteenth Amendment is irrelevant because plaintiff's claim is not dependent upon whether or not the fetus enjoys a constitutional status as a "person." The claimed malpractice committed by defendant was directed against plaintiff as an expectant mother and thus was a direct, not a derivative claim. See Giardina, supra, 111 N.J. at 413, 545 A.2d 139 ("the medical malpractice causing an infant stillbirth constitutes a tort against the parents, entailing the direct infliction of injury ...").
In our view, plaintiff's emotional distress claim is well-founded under New Jersey law. The claim of emotional distress in this context has evolved by recognition of the intimate familial relationship between the claimant and the immediate victim, Giardina, supra, 111 N.J. at 417, 545 A.2d 139, and "the foreseeability of parental suffering...." Ibid.
For example, in Portee, supra, the Court recognized a common-law cause of action for negligent infliction of emotional distress in a "bystander" case, where plaintiff established the following elements: "(1) the death or serious physical injury of another caused by defendant's negligence;
*158 (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." 84 N.J. at 101, 417 A.2d 521. In the so-called wrongful birth cases, the Court held in Berman v. Allan, 80 N.J. 421, 439, 404 A.2d 8 (1979), that a defendant's failure to advise a pregnant woman of the availability of amniocentesis permits recovery by the parents for their mental and emotional injury on account of their child being born with congenital defects. Similarly, in Schroeder v. Perkel, 87 N.J. 53, 63-64, 432 A.2d 834 (1981), the Court held that an emotional distress claim of parents was cognizable for defendant's negligent genetic counseling, which deprived the parents of the opportunity of considering the wisdom of having another child.
In Giardina, supra, 111 N.J. at 420, 545 A.2d 139, the Court extended the emotional distress cause of action to parents of a stillborn infant. It concluded that "the medical malpractice causing an infant stillbirth constitutes a tort against the parents, entailing the direct infliction of injury, their emotional distress and mental suffering, for which they are entitled to recover compensatory damages." Id. at 413, 545 A.2d 139. It explained, "[b]y recognizing such a cause of action we protect the interests affected by the tortious conduct resulting in the death of an infant before birth." Ibid. The Court added:
Medical malpractice causing a stillbirth results in infliction of a direct injury to the mother as well as to her unborn child. Even without any permanent physical harm, the mother suffers severe and genuine injuries in the form of emotional distress and mental anguish occasioned by her baby's stillbirth. This suffering is experienced, also, by the father of the infant. Thus, in a case such as this, the injury suffered by the mother and father on the stillbirth of their eagerly expected first child is palpable and predictable.
[Id. at 415, 545 A.2d 139.]
We are satisfied that the Giardina cause of action should be available to plaintiff. It is, of course, true that in this case, unlike Giardina, there was no "birth" at all. Thus, defendant argues, Giardina's cause of action in the present context is not available because there was no expectation of birth of a healthy child and no birth process at all. Defendant reasons that without these facts, the claim for negligent infliction of emotional distress is constitutionally precluded because it is not a direct claim by plaintiff, but like a wrongful death claim, wholly derivative. We reject the argument. First, as stated, the cause of action for emotional distress set forth in Giardina is not derivative, but direct. See 111 N.J. at 413, 545 A.2d 139.
Second, the thrust of plaintiff's claim is that there was no expectation of birth of a healthy child and no birth process because of defendant's tortious conduct. In other words, she was deprived of these intimate experiences because she was not informed of the material consequences of the procedure. In Giardina, it was negligent treatment. Here, it is the failure on the part of a physician to impart information about the status of the fetus and other information that may have been material to plaintiff in making her choice. There is no logical basis to distinguish the cases simply because the tortious conduct of the defendants differed, or that the fetus in this case did not survive full term.
Defendant further argues that the "death" of a fetus as a result of a termination of pregnancy should not be treated as akin to a stillbirth because, unlike a stillbirth, it is the desired outcome. This argument, of course, begs the question. *159 Whether the termination was the "desired outcome" is a fact-based issue. Defendant's argument wrongly presumes the failure of plaintiff's proffered proof that her consent to the termination of pregnancy was not informed.
We deem plaintiff's emotional distress cause of action as a logical complement to the "wrongful birth" cases, which involve a "violation of the interest in self-determination," and which focus on "the parents' lost opportunity to make the personal decision of whether or not to give birth to a child who might have birth defects." Canesi v. Wilson, 158 N.J. 490, 501-02, 730 A.2d 805 (1999) (citing Schroeder, supra, 87 N.J. at 66, 432 A.2d 834; Berman, supra, 80 N.J. 421, 404 A.2d 8, and Procanik v. Cillo, 97 N.J. 339, 478 A.2d 755 (1984)). "[A] woman's right to determine for herself whether or not to continue or terminate her pregnancy... protects a distinctively personal interest." Canesi, supra, 158 N.J. at 501, 730 A.2d 805. The "distinctively personal interest" to choose not to give birth to a baby has a logical corollary; a distinctively personal interest, based on a woman's circumstances and discrete moral and religious beliefs, to choose not to terminate the pregnancy after being informed by her physician regarding the status of the fetus and all other facts that may be deemed material in making that choice. The wrongful birth of a baby with a congenital defect may obviously give rise to profound mental anguish. Based on the circumstances, background and beliefs of a mother, inducing her to terminate the pregnancy, even at eight weeks, because of the physician's failure to obtain an informed consent may also result in severe distress and mental anguish. See Willis v. Ashby, 353 N.J.Super. 104, 112, 801 A.2d 442 (App.Div.2002) (quoting James R. Woods, Jr., M.D. and Jenifer L. Esposito Woods, M.B.A., Loss During Pregnancy or in the New Born Period: Principles of Care with Clinical Cases and Analyses 5 (Jannetti 1997)) ("`[t]he vast majority of people respond to pregnancy loss, regardless of gestational age, as the death of a baby and the subsequent death of their hopes and dreams'"; emphasis added). Plaintiff, of course, is left to her proofs on this point. We reverse dismissal of plaintiff's emotional distress claim and remand for further proceedings.
Affirmed in part; reversed in part and remanded for further proceedings.
NOTES
[1] Plaintiff has not appealed from the trial court's dismissal of counts three and four, asserting a survivorship claim. Count six, plaintiff's claim against defendant that he negligently performed the abortion, count eleven, for personal injury to plaintiff against all defendants, and counts seven through ten, against an unidentified nurse, are not the subject of this appeal.
[2] According to plaintiff, she is prepared to prove at trial that her "child" was eight weeks old on April 9, 1996.